STATE v. W. A. ANDERSON.

*Evidence—Declarations—Conspiracy—Res Gestœ—Removal—*
*Record.*

1. While it is a general rule of evidence, that the acts and declarations of a person in the absence of the prisoner, are not admissible in evidence against him, yet there are exceptions, one of which is in case of a conspiracy to do an unlawful act, when the acts and declarations of conspirators, in furtherance of the common purpose, are competent, although made in the absence of the others.

2. The least degree of consent or collusion between parties to an illegal transaction, makes the act of one the act of the others.

3. Where, in order to admit the acts and declarations of a third person as evidence against the prisoner, the State alleges that there was a conspiracy, the regular method of proceeding is for the State, in the first place, to establish the fact of a conspiracy by proof, but the Judge, in his discretion, may allow the acts and declarations to be given in evidence, the solicitor undertaking to prove the conspiracy at a later stage of the trial.

4. The acts of the different parties alleged to be conspirators may be given in evidence to prove the conspiracy.

5. The rejection of evidence by the Court, which if admitted, would have been prejudicial to the prisoner, cannot be assigned as error.

6. The declaration of a conspirator, at the very time of the homicide, who was in close proximity to, but not within sight of the prisoner, upon hearing a pistol shot, that the prisoner had killed some one, is admissible in evidence.

7. To constitute *res gestæ* there must be *an act* which may be explained by contemporaneous declarations. So where it was alleged that there was a conspiracy between a person and the prisoner to take possession of a certain mine, in doing which the homicide took place, the declarations of such person when setting out to take possession of the mine, as to his motives in doing so, are not competent evidence for the prisoner.

8. A Judge is not required to give instructions in the very words in which they are asked, and when the charge to the jury substantially embraces the prayer for instructions, it is no ground for a new trial.

9. It is not error to refuse a prayer for instructions which is not founded on any evidence in the case, and is purely hypothetical.

10. Where an affidavit for the removal of a case, stated that the State could not get justice in either Mitchell or Yancey counties, and this was recited in the order, and the cause removed to Caldwell county; *Held*, to be no ground for an arrest of judgment.

11. It is no ground to arrest the judgment, because on such removal two transcripts are sent to the county to which it is removed, although the first is defective, and the second is transmitted without a writ of *certiorari*.

12. Where the clerk sends a defective transcript on the removal of a cause, it is not a compliance with the order, and he may, of his own motion, send another.

13. Upon the removal of a trial for murder, the record showed that the prisoner was arraigned, and then the order of removal immediately follows, before any order remanding the prisoner; *Held*, that it appears by necessary implication that the prisoner was in court when such order was made.

(*State* v. *Jackson*, 82 N. C., 565; *State* v. *Shepherd*, 8 Ired., 195; *State* v. *Collins*, 3 Dev., 117; *State* v. *Craton*, 6 Ired., 164; *State* v. *Chavis*, 80 N. C., 353, cited and approved).

This was an INDICTMENT for murder, heard before *Avery, Judge,* and a jury, at January Special Term, 1885, of CALD-WELL Superior Court.

James Hoskins, a witness for the State, testified as follows: The homicide occurred on Sunday. On that Sunday I rode with prisoner and Ed. Ray a part of the way from Bakersville in the direction of the mica mines. They were on horseback. This was before the homicide occurred. Before I left the prisoner that day, he told me that if he should stay out at the mine that week, he wanted me to come out to see him, and take a deer-hunt, and he wished me to tell Mr. Abernathy (a merchant in Bakersville), to send him (prisoner) some No. 22 cartridges to fit his gun. The prisoner did not have a gun at the time.

　　　　IN THE SUPREME COURT.

John Buchanan was introduced for the State, and testified as follows: In the afternoon of the Sunday in which the deceased was killed, I saw the prisoner and Ed. Ray about three miles from the mine where the homicide occurred, riding on horseback in the direction of the mine. They rode up to Polly Sparks' house together, from the direction of Bakersville, about 4 o'clock. They stopped together and rode off together.

Isaac Stewart was examined for the State, and testified as follows: I was at the mica mine near Flat Rock where the homicide occurred, on Sunday evening. While I was there, the prisoner and Ed. Ray rode up and got off their horses. I left in five or ten minutes after they arrived and went to my house, which was between a quarter and a-half mile from the mine. I rode there and put my horse in the stable, and had just gotten into the house, and was pulling off my spur, when I heard a shot. I started out immediately, and as I got into the yard I heard two more shots. I ran to the stable, caught a horse and rode over to the mine. I met the prisoner and Ed. Ray about two hundred yards from the mine, walking in the direction of Bakersville. They had sent their horses off on their arrival, before I left the mine for my house. The deceased, Ed. Horton, was alive and well when I left the mine to go home. I found him on my return, lying dead in a path about the edge of one of the dumps thrown out of the mine, with his head down the hill. His right leg was doubled under him. His left hand was under his head, and he was shot through his right hand. I did not examine his body at that time, but saw that he was shot in the head, in the edge of his forehead. I felt his clothes and satisfied myself that there was no weapon on or about his person. It had rained the night before, and that evening it was drizzling. I did not examine the ground carefully that night, but I saw no sign of a scuffle. I did examine the ground the next day, and saw no signs of a conflict, but people had meantime been walking about there a good deal. There was two shafts sunk at the mine. The two shafts were about fifty-five feet apart; but the dumps had

been formed by the earth thrown out of each shaft, and the edges of the dumps were near together, about 20 or 25 feet apart. I left the deceased, Ed. Horton, Cebe Miller, Stephen Burlison, Bob Penland and Mitt Buchanan at the mine, when I went home on the arrival of the prisoner and Ray. Deceased and Miller were then on the outside of the mine. I think that the other two named were then inside of the lower shaft. The prisoner and Ray were at the upper shaft outside.

The solicitor proposed to show by the witness that he found the body of the deceased near the mouth of the lower shaft, and that he went down into the mine at the lower shaft, and what he found to be the condition of the other persons he had left at the mine, inside and outside of the shaft. The solicitor proposed to show that he found two of them dead or dying and a third wounded, as tending to show the nature and cause of the difficulty, and, in connection with other testimony, to explain the motive of the prisoner, and to show a conspiracy between the prisoner and Ray to take possession of the mine by force. Objection by the prisoner overruled and prisoner *excepted*.

The witness testified further, as follows, viz.: I went to the mouth of the lower shaft. I heard groaning and sent for a rope and a light. I then went into the lower shaft. I found Cebe Miller lying on his back, not able to speak. Stephen Burlison was also lying down in the shaft and had been wounded, apparently by a shot. I saw Bill Burlison also. He appeared to have been shot. Bob Penland was also in the shaft, but was not hurt. I saw Reuben Sparks standing at the upper shaft when I first went to the mine on Sunday afternoon. When the prisoner and Ed Ray dismounted, Reuben Sparks took their horses off.

The Solicitor then proposed to ask witness who was in the actual possession of the mine and working it immediately before the killing. The Solicitor proposed to prove by the witness that Cebe Miller, Mitt Buchanan, deceased, and others were in actual possession of the lower shaft from the time they began to open it about two months before, continuously up to the time of the

homicide, and that they opened the upper shaft also, some time before, and had remained in possession of it until Saturday night immediately preceding the homicide, when Ed Ray claimed to have taken possession of it, and had left Reuben Sparks at the mouth of it and had gone off.

This testimony was offered to be taken in connection with testimony of Hoskins, that Anderson had spoken to him of remaining at the mica mine, and other testimony, thereafter to be offered, that prisoner and Ray both came armed, and had difficulties in and near the lower shaft, as tending to show an unlawful purpose on the part of the prisoner to commit a trespass, and that he did commit a trespass.

Objection for the prisoner overruled, and prisoner excepted.

The witness then testified that Cebe Miller and Mitt Buchanan were in possession just before and at the time of the homicide.

Mitt Buchanan was introduced for the State, and testified as follows, viz.: Cebe Miller and I were in possession of the mine, both the upper and lower shafts, on Saturday, the day before Horton was killed. I left the mine about 10 o'clock, Saturday morning, but left the hands working, and up to that hour had never seen prisoner or Ed Ray at the mine. I had never seen either of them there till the Sunday that the homicide occurred. I had been working at the mine for six or seven weeks, continuously, before the difficulty. I returned between 2 and 3 o'clock on Sunday evening, and found Reuben Sparks and Hardy Sparks at the upper shaft, and Cebe Miller and Palmer Ellis in the lower shaft. I went down into the lower shaft, and was there when Miller and Burlison were killed. The Solicitor proposed to show, at this point, by the witness, what occurred inside of the lower shaft, about the time he heard firing on the outside, but the Court, on objection, refused to allow the witness to state then what was done in the shaft.

Witness testified further, as follows:

While Ray was in the lower pit, I heard a pistol fire outside. I soon heard a second shot outside, and very quick I heard a

third shot.   I went out of the mine in about three or four minutes after I heard these shots.   As I went out I saw a man walking off of the dump.   I went home then without seeing Horton.

Arthur Buchanan was next introduced as a witness for the State, and testified as follows : I went to the mine about one or two o'clock Sunday afternoon.   Hardy Sparks and Reuben Sparks were there, at the upper shaft.   They were right close to the mouth of the upper shaft.   I went down to the lower shaft.

The prisoner's counsel had asked the witness Stewart, if Reuben Sparks and Hardy Sparks had not been in possession of the upper shaft before Ray and Anderson came, and if Ray, prisoner, and Reuben Sparks were not in possession of the upper shaft when he, Stewart, left to go home, just before the homicide. This was asked with the view, as expressed at the time, of showing that Reuben Sparks, Ray and prisoner jointly held possession of the upper shaft, and the witness Stewart had testified on cross-examination, that Reuben Sparks was at the mouth of the upper shaft when Ray and Anderson came up ; that they dismounted and gave their horses to Reuben Sparks, who took them away, while Ray and Anderson remained, and he left them standing near the mouth of the upper shaft.

The Solicitor proposed to show by the witness, what Reuben Sparks said, if anything, about his possession, when he left Reuben and Hardy Sparks at the fire at the upper shaft and started down to the lower shaft, after he came on Sunday.

The Court held that after the prisoner had brought out the fact that Reuben and Hardy Sparks were at the upper shaft, to show possession in the prisoner and Ray, it was competent to prove the declaration of Sparks in reference to to the possession.

The prisoner excepted.   The Court overruled the exception, and the witness then testified as follows : Either Reuben Sparks or Hardy said to me that they had possession, and were going to hold it.

William Burlison was next introduced for the State, and testified as follows : I went to the mine about 2 or 3 o'clock on Sun-

47

day evening. I found the two Sparks boys, Reuben and Hardy, sitting on the upper dump. I stood there and talked to them for some time. I went down then to the lower shaft, and went down into the mine. I came out and went to my father's house to get some tools. I met Ed. Ray and the prisoner three-quarters of a mile from the mine, coming from the direction of Bakersville. On my return I saw the prisoner standing on the upper dump. I went on down to the lower shaft, and threw my tools into the pit or shaft. Ed Ray and Cebe Miller were then talking on the edge of the lower pit. Ed tried to catch the tools and missed them. He then drew back a gun that he had across his lap to strike me. Cebe Miller said, "don't do that Ed, Bill don't know it." I looked towards Anderson, and then looked at the other two, and saw Ray knock Miller into the pit. Ray looked up at me, and I knocked him into the pit and lost my balance in doing so, and went in after him. I struck Ray with my fist. The pit was only ten or twelve feet deep. While I was in the pit, I heard some person say, "you leave here, Ed. Horton, or I'll kill you." I took it to be the prisoner's voice. I then heard Ed. Horton say, "I will, I will, I will." I knew Ed. Horton well and I knew his voice. I did not see him just before I fell into the pit or shaft. Immediately after Horton said "I will," I heard two or three shots, or it may be more. I am not certain as to the number.

E. A. Putnam was examined as a witness for the State, and testified as follows: I went to the mine from Isaac Stewart's. I saw Anderson and Ed. Ray at the mine. Ray stepped in front of Cebe Miller and Ed. Horton and forbade them to go any further down towards the lower shaft. Miller stepped around Ray and went into the lower pit. Ray followed and Horton went down behind Ray. I was standing at the upper pit with Anderson and John Butler, while Miller and Ray were talking. Bill Burlison went down and threw some tools into the lower pit. Ray said, "what did you do that for," and cocked his gun. Anderson said to me and John Butler, "come on, boys, and let's

go down." Butler and I did not go down. When Anderson got to the lower pit, Ray, Miller and Bill Burlison had gone into the pit. When Ray cocked his gun, Anderson put his hand to his hip-pocket. Anderson *started down before the fight began.* After Ray, Miller and Burlison went into the pit, Anderson and Horton were left outside. I heard Anderson say to Horton, "Dam you, I'll give you five minutes to leave." I then saw Horton start off from him. About the time Horton was starting off, I heard the prisoner say, "damn you, I want to kill you anyhow." When Anderson told Horton to leave, he said "I will," and started. I saw Horton start, and he had gone about six steps, when I heard Anderson shoot. Anderson shot three or four times. I am certain that he shot three times. After that the firing began in the lower pit, everything became still, and I left and went down to Hensley's about 100 yards. I came back to the mine with Isaac Stewart in three or four minutes after the shooting. It was not more than a-half a minute after they fell into the pit, till Anderson told Horton to leave. It was not a-half minute later, when Anderson fired at Horton. I was looking towards the lower pit; from the time Anderson went down, till Horton started away, I saw no scuffle. I think I could have seen it if Horton had done anything to Anderson. I had been hired by Miller that evening to go up and commence work after mid-night Sunday night. Butler and I were standing at the middle of the upper pit. Horton was on the west of the lower pit. Anderson passed down between Horton and the lower pit. I saw Horton and Anderson, when Horton said "I will." I did not see Horton when Anderson first fired; Horton had passed behind some bushes and I did not see him again alive.

On cross-examination, prisoner proposed to show by the witness Putnam, that when Ray started down to the lower pit, Anderson said, "If Bayley shows title, I will have nothing more to do with it."

The solicitor objected to proving the declaration of the prisoner. Objection sustained, and prisoner excepted. The solicitor had not offered to prove his declarations at that time.

Robert Penland was next examined as a witness for the State.

The solicitor had offered to prove by Buchanan what occurred in the lower pit after Ray and Miller went into it, but, on objection from the prisoner, the Court had refused to allow him to do so. It being now in evidence that the prisoner and Ray left Bakersville together; that Ray had a gun; that prisoner had ordered cartridges to be sent out for a gun if he should remain all the next week; that Ray and prisoner had come to the mine and had their horses put up by Sparks, and had claimed possession of the mine; that Miller and Buchanan had previously been working at the mine, and had actual possession of the lower shaft, and were then in the shaft; that Ray had knocked Miller into the mine, after cocking his gun, in about fifty feet and in sight and hearing of the prisoner; that when Ray cocked his gun, and before he fell into the pit, the prisoner started from the upper shaft and came to a point within five or six feet of the lower pit; that the lower pit was only ten or twelve feet deep, and that persons inside of the pit could hear what was said by the prisoner and deceased to each other; the solicitor now insisted that it was competent to show what occurred inside of the pit as part of the *res gestæ*, the prisoner being near enough to hear what was said and done inside, and as tending to show the motive of the deceased to aid Ray in committing a trespass, by preventing Horton from going into the shaft to assist his comrades.

The solicitor insisted also that there was testimony tending to show a conspiracy between the prisoner and Ray to commit an unlawful act, in taking forcible possession of the mine, and it was therefore competent to prove the acts and declarations of Ray in furtherance of the common purpose.

The prisoner objected to proving what occurred inside of the lower shaft, and especially to proof of any declaration made by Ray, as incompetent and irrelevant. It was insisted for the State, also, that persons inside of the pit testified that he was fifteen

steps from the mouth of the pit, while the prisoner was five or six. The objection was overruled, and the prisoner excepted.

Witness then testified as follows: When they all fell in, Miller caught on his hands and sprang up and said, "pull him off." Miller then caught Ray and hit him two licks. Ray said, "let me up; don't kill me; let me up, and I'll go out." Burlison was also on Ray then, and Ray's gun was under him. Ray, Miller and Burlison were at the bottom of the lower shaft. Just then I heard what sounded to me in the tunnel like hitting a log with an axe. It was a dull noise. It did not sound to me under ground in the tunnel like the report of a gun or pistol. I heard but one report, when Ray immediately spoke, witness not having heard another sound. Ray said, "Let me up, Waits has killed some one." Anderson was called "Waits." They let him up and he began to shoot. He first shot Miller; then he shot the two Burlisons, William and Stephen.

John Butler, a witness for the State, testified as follows: I went to the mine on Sunday night with Cebe Miller, Ed. Putnam and Ed. Horton. When we got to the upper shaft we found Anderson there, and Ray about the lower shaft. Miller went to the lower shaft and Ray followed him to go in. Miller then forbade Ray to go in. Ray said that the mine was his. Miller said, "Mr. Ray, if you've got any deed to it fetch it up, and if you've got more right than I have, you can have it." Putnam, Anderson and myself were then at the upper shaft. Just before Ray pushed Miller into the shaft, Anderson, who was then at the upper dump, said, "boys, let's go down and part them before they get into it." I said, "I won't have any part in it, and I'm not going." Just as Anderson got down to the lower shaft, they fell into it fighting. Horton was then down on the lower dump. Anderson stood on the lower dump about a minute. Horton was on the west side of the dump. Anderson said, "Ed. Horton, God damn you, I'll give you five minutes to get away from here, and if you don't, I'll shoot you." Horton started, and said, "I will, I will, I will, don't shoot me." Hor-

ton started, and when he got about six steps he passed behind a chinquepin or ivy bush and a laurel bush. When he passed behind these bushes, I could not see him. Just as he got behind the bushes the pistol fired. I saw Anderson, and saw his pistol when he fired. He was standing on the edge of the dump, with his face towards Horton. After the first shot, I turned to the right, and saw only the first shot fired, but I heard the other shots. There were two paths. Horton came the straight path towards me till he was behind the bushes. It was about a minute after he passed behind the bush that Anderson first fired. When Anderson told Horton to leave, he turned right off and walked as fast as he could, till he got behind the bushes, about six steps from Anderson. I went off and came back in about fifteen minutes and found Horton dead on the dump. Anderson was in four steps north of the lower pit, and was about thirty feet from me when he fired.

On cross-examination, the witness stated: I was living with Isaac Stewart about 300 yards from the mine. When I went to the mine it was getting dusky dark. Ed. Horton was standing on the west of the shaft when they all. tumbled in. Anderson was standing close to the shaft, looking into it; after they fell in Anderson stood there about a minute before he spoke. Neither Anderson nor Horton moved until Anderson spoke to Horton.

This witness was contradicted by several witnesses, but in what particular the case on appeal does not state.

There was some testimony offered by the State showing a threat, on the part of the prisoner, against the deceased, and a fight between them, in which the deceased had been severely beaten by the prisoner, about two years before the homicide, for which Anderson was indicted and was heard to say, "this thing has cost me fifty dollars, and if I get into it again I intend to kill." This was said in the spring before the homicide.

The prisoner was examined in his own behalf, and counsel proposed to ask him what Ed Ray said to him before leaving Bakersville, that induced him to go to the mine, and, on objection

for the State, the Court held that the prisoner would be allowed to testify as to his motive or purpose in going to the mine, in order to rebut proof offered by the State to show motive, an unlawful purpose, but that the prisoner would not be allowed for that purpose, to state the declarations of Ray. The prisoner excepted to the refusal of the Court to allow him to state what Ray said.

He then testified as follows : Ray went with me to the mine. I had no reason to believe, and did not believe, that there would be a difficulty about the mine. I did not know where the deceased was, and did not think that I would meet him at the mine. I saw Hoskins in Bakersville. I told Hoskins that if I stayed at the mine the next week, he must go to Abernathy and get some No. 22 cartridges for my gun. Ray took my gun along. I did not take any cartridges for it. He took the gun, now exhibited, and it then belonged to me. The gun was taken to hunt and pass off the time. I reached the mine after sundown, and found Reuben Sparks at the upper shaft, and Isaac Stewart, Ed. Horton and others (don't remember who), at the lower shaft. When Ray and myself reached there, Reuben Sparks took our horses off to feed them and put them up. Very soon Cebe Miller and Ed. Horton went off together, and shortly after Isaac Stewart left. The prisoner further testified, at considerable length, to a state of facts which, if believed by the jury, showed that the killing was done in self-defence. It is not deemed material to set out the evidence in full.

A large number of witnesses were introduced for the prisoner, and testified that his character was good—some, on cross-examination, said that his reputation was that of a dangerous man. Hardy Sparks, a witness for the prisoner, corroborated the prisoner in regard to some portions of his testimony.

On cross-examination this witness testified that he went to the mine with Ed. Ray on Saturday evening, the day before Horton was killed, and that he found Miller and Sherman Buchanon at the mine. Prisoner's counsel had, in cross-examination of two of the witnesses for the State, attempted to show that Ray had

possession of the lower shaft, and afterwards that Miller and Buchanan had abandoned the mine, or gone out, leaving no person in it. Prisoner's counsel had also attempted to show an agreement between Miller and Ray that the question of possession and title were to be settled the next day, and that Miller should put no tools into the mine, as bearing upon the question whether the lower shaft was in the actual possession of Miller and Buchanan. The prisoner had also testified to a conversation between Ray and Miller, and that after the conversation, Miller said to the man with him, "throw down your tools."

Counsel for the State proposed to show that on Saturday night (the night before Horton was killed), Ray attempted to smoke Cebe Miller and Buchanan, or those working under them, out of the lower shaft, and failed to get them out and left them in the shaft. This is offered as tending to show actual possession in Miller and Buchanon, and that the prisoner was assisting Ray in committing a trespass, when he killed Horton. The solicitor also insisted that it was competent as tending to contradict the testimony of the prisoner, that Ray told him that he had peaceable possession of the mine, and the court having held that there was evidence tending to show a conspiracy or common purpose on the part of Ray, Anderson and Sparks, to take possession of the mine, the solicitor insisted that it was competent to show the acts of a conspirator, after Anderson went to Ray's house and came with him to Madison county and then to the mine. The objection was overruled and the prisoner excepted.

The witness then testified as follows: Cebe Miller, Jim Miller and Sherman Buchanan were in the shaft Saturday night, the night before the difficulty. Ray built up a fire in a tunnel that communicated with the lower shaft, and fanned the fire to make the smoke go into the shaft and run them out; he was carrying wood to the fire, when my brother and myself went there on Saturday night. He took his hat and fanned the fire to smoke them out. Ray said he believed that he could smoke them out. He came out of the tunnel after that, and called Miller and told him to

come out. Miller refused to do so. Ray then said to me, "let us throw in a little dirt and try to scare them out." I helped him throw in the dirt till my brother Hardy Sparks told Ray to quit.

Cebe Miller and Milton Buchanan had done all the digging that had been done in the mine. I left the mine about nine o'clock, Saturday night, and went to Bakersville. I returned to the mine Monday morning, about eight o'clock. I saw Ray and Anderson Sunday evening on their way to the mine. Either Ray or Anderson had a gun Sunday evening. I am not certain which had it. Ray left in the morning, about nine o'clock Sunday morning, and went towards Bakersville; he stopped at my house about four o'clock P. M. of the same day, coming with the prisoner back to the mine. There was no one working either in the upper or lower shaft when Ray got to the mine on Saturday. Ray and myself took possession of the upper shaft; my brother and myself remained there, when Ray left Monday morning, till three o'clock Monday afternoon.

On Saturday, Jim Miller was standing on the dump of the lower shaft, and said, "come up gentlemen, you need not be scared." He then said, "come down in the shaft." Miller went down first, and Ray, Buchanan and myself followed. Ray told Miller to come out, that he had a deed to the mine. Miller told Ray "that he was there to hold possession, and he was going to hold it unless he should be killed and taken out." Ray said, "that he did not come there for a difficulty," and handed them a deed and told them to read it. They both said they could not read. Ray and I came out of the mine.

Prisoner introduced a number of witnesses, who testified that the deceased had threatened to kill the prisoner on several occasions, and that these threats had been communicated to the prisoner.

The Solicitor introduced a number of witnesses who testified that the general character of the prisoner was that of a violent and dangerous man—some of them testified that his character

for truth and honesty was good. The prisoner offered other testimony to show that his own character was good, and to show that the deceased was a violent and dangerous man. It is not deemed material to give the testimony in full.

The jury returned a verdict of guilty of murder. The prisoner's counsel moved in arrest of judgment, and assigned the following grounds :

1. For that the affidavit upon which the order was made for the removal of the cause from Mitchell to Caldwell county, and the order itself, states not only that the State cannot have a fair and impartial trial in Mitchell county, but includes Yancey county also.

2. That there are two papers purporting to be transcripts, and no writ of *certiorari*, and the two are essentially different. That the first is not properly certified, and the second is not a return in obedience to any writ.

3. For that it does not appear that the prisoner was in court when the order for removal was made.

The motion in arrest of judgment was overruled. There was a rule for a new trial—the rule was discharged, and the judgment of the court was pronounced against the prisoner, from which he appealed to the Supreme Court.

*The Attorney General* and *Batchelor & Devereux,* for the State.
*Messrs. G. N. Folk* and *R. F. Armfield,* for the defendant.

ASHE, J. (after stating the facts). There were a number of exceptions taken by the prisoner to the rulings of the court in admitting and rejecting evidence, and to the charge of the court to the jury, and the refusal to give the instructions asked by the prisoner.

The first exception : Stewart, a witness for the State, had testified that he was at the mine on Sunday evening when the prisoner and Ray arrived. Soon after their arrival, he went home, leaving Horton alive at the mine, but, within a few minutes after

getting home, he heard the report of fire-arms in the direction of the mine and hurried back and found Ed. Horton lying dead in a path, at about the edge of one of the dumps, shot through his right hand and in his head near the edge of his forehead.    Witness saw no signs of a scuffle that night and none the next day, though there had been a good many people passing about.

The solicitor then proposed to show by the witness, the condition in which he found the persons he had left at the mine, on his return, both inside and outside of the mine.    The solicitor proposed to show by the witness that he found in the lower shaft, two of them dead or dying, a third wounded, and Horton lying dead on the outside, as tending to show the motive and cause of the difficulty, and in connection with other witnesses to be offered, to explain the motive of the prisoner, and to show a conspiracy between the prisoner and Ray to take possession of the mine. The counsel for the prisoner resisted the admission of the evidence and contended that the proposed evidence was incompetent; that the prisoner was charged with the killing of Ed. Horton, and his guilt in killing him cannot be established by the proof of another crime; that the evidence must be confined strictly to the point at issue.    This, as a general rule, is unquestionably true. But there are exceptions, one of which is, where two or more persons enter into a conspiracy to do an unlawful act, whatever is done by either of them is evidence against the other, if done in furtherance of the common object of the conspiracy—*Roscoe Cr. Ev.*, 387—and the least degree of consent or collusion between the parties to an illegal transaction makes the act of one of them, the act of the other.    2 *Wharton's Law of Evidence*, §1205.

The same principle applies to declarations made by one conspirator in furtherance of the common design, so long as the conspiracy continues, though made in the absence of one of them. *Ibid, supra.*    The State alleged that there was in this case a conspiracy between the prisoner and Ray to illegally dispossess Miller and Buchanan of the mine.    In such case, the regular mode of proceeding is to establish the conspiracy in the first place, by

proof, and then offer the acts and declarations of any one of the conspirators against the others. But this rule is often departed from, though it is an inversion of the order, for the sake of convenience, and the prosecution allowed either to prove the conspiracy, which makes the acts of the conspirators admissible in evidence against each other when done in furtherance of the common object, or he may prove the acts of different persons, and thus prove the conspiracy. *Roscoe Cr. Ev.*, 385. Mr. Greenleaf, Vol. 1, page 127, maintains the same rule in the following passage: "Sometimes for the sake of convenience, the acts or declarations of one are admitted in evidence before sufficient proof is given of the conspiracy, the prosecution undertaking to furnish such proof in a subsequent stage of the cause. But this rests in the discretion of the judge, and is not permitted, except under particular and urgent circumstances, lest the jury should be misled to infer the fact itself of the conspiracy from the declarations of strangers; and here also care must be taken, that the acts and declarations thus admitted be those only which were made and done during the pendency of the criminal enterprise and in furtherance of the objects." And see also *State* v. *Jackson*, 82 N. C., 565. This was the course pursued in this case. The solicitor announced that he offered the evidence in connection with other testimony to be adduced, to show a conspiracy between the prisoner and Ray to take illegal possession of the mine, and the Judge, in exercise of his discretion, allowed it.

*Ex.* 2. The solicitor proposed to ask the witness Stewart, who was in the actual possession of the mine and working it just before the killing. He proposed to prove that Cebe Miller and Milton Buchanan, deceased, and others were in the actual possession of the lower shaft at the time of the homicide; and of the upper shaft also, until the Saturday night previous, and continuously up to that time, when Ray claimed to have taken possession.

This testimony was offered to be taken in connection with the testimony of the witness Hoskins, theretofore examined, who had

testified that the prisoner on Sunday evening, while in Bakersville, told him that, if he should remain at the mine that week, he wanted him to come out to see him and take a hunt, and other testimony to be thereafter offered, that prisoner and Ray both came armed, and had a difficulty near the lower shaft, as tending to show an unlawful purpose on the part of the prisoner to commit a trespass, and that he did commit a trespass.

We can see no objection to the admission of this testimony for the purpose for which it was offered.

*Ex.* 3. The prisoner's counsel had asked the witness Stewart if Reuben and Hardy Sparks were not in possession of the upper shaft before Ray and prisoner arrived at the mine on Sunday evening, and if Ray, prisoner, and Reuben Sparks, were not in the possession of the upper shaft when the witness left to go home, just before the homicide. This was asked with the view, as expressed at the time, of showing that Ray, prisoner and Reuben Sparks were in the joint possession of the upper shaft at the time the witness left. The Court held that after the prisoner had brought out the fact that Reuben and Hardy Sparks were at the upper shaft, to show possession in the prisoner and Ray, it was competent to prove the declarations of Sparks in reference to the possession of Ray.

The witness Arthur Buchanan, who was then under examination, testified that either Reuben or Hardy Sparks said to him that they "had possession and were going to hold it."

The declaration of Sparks was clearly admissible upon the ground taken at the time by the solicitor, that testimony had been offered to show a conspiracy to take possession of the mine, between the prisoner, Ray, Hardy and Reuben Sparks, and that the declaration of either was competent, and whatever defect there may have been in the testimony offered up to that period of the trial upon the point of conspiracy, it was fully supplied by the subsequent testimony.

*Ex.* 4. On the cross-examination of the witness Putnam, the prisoner proposed to show that when he started down to the

lower pit, while Ray and Miller were sitting there, he said, "If Bailey shows title, I will have nothing more to do with it." The Court, upon objection by the solicitor, refused to admit the declaration. · We cannot see how the rejection of this evidence could have worked any possible prejudice to the prisoner. Conceding it was admissible as part of the *res gestœ,* its reception would have operated to his prejudice instead of his benefit, for it could have had no other effect than an acknowledgment that he did have *something* "to do with it," evidently referring to the taking the possession of the mine, and there is no inference to be drawn from the declaration that it was his intention to have *nothing more* to do with it then and after that time, but after Bailey should show that he had title, and Bailey was not expected to make any exhibition of his title until the next day. It did not indicate any intention of abandoning the illegal possession which he had acquired as trespasser. So far from that, in less than five minutes after his claimed declaration of peace,· he shoots to the death, one of those who were in the rightful possession of the mine.

The error complained of not being prejudicial to the prisoner, it is no ground for a *venire de novo.* State v. *Frank,* 5 Jones, 384.

*Ex.* 5. The solicitor proposed to prove by the witness Buchanan, what occurred in the lower shaft, insisting that it had been proved that Ray and the prisoner had left Bakersville together; that Ray had a gun; that prisoner had ordered cartridges should be sent out for a gun if he should remain during the week; that they claimed possession of the mine; that Miller and Buchanan had been previously working at the mine, and had actual possession of the lower shaft, and were then in the shaft; that Ray had knocked Miller into the shaft, after cocking his gun, and this in about fifty feet and in sight and hearing of the prisoner; that when Ray cocked his gun, and before he fell into the pit, the prisoner started from the upper shaft and came within five or six feet of the lower pit; that the lower pit was only ten or

twelve feet deep, and that the persons inside the pit could hear what the prisoner and deceased said to each other. He insisted that it was competent to show what was said and done inside the pit, not only as part of the *res gestœ*, but as evidence of a conspiracy between Ray and the prisoner to commit an unlawful act, in taking forcible possession of the mine, and the motive the prisoner had to aid Ray, by preventing Horton from going into the shaft to the assistance of his comrades. The Court sustained the view taken by the solicitor, and over-ruled the exceptions of the prisoner and admitted the testimony. The witness then proceeded to testify to what was said and done inside the pit.

In this ruling of the Court there was no error. The conspiracy had been established by the proof, and it was perfectly competent for the Court to hear testimony of what was said and done by Ray in the pit, in furtherance of the common purpose, or what any of those engaged with him in the pit in his presence said or did, as a part of the *res gestœ*. But the prisoner's counsel contended that the exclamation of Ray while in the pit, and held down by Miller and Burlison, "there, Waits (meaning the prisoner) has killed some one," was not competent. To make it so, "two things must concur, first, there must be a common purpose between the declarant and the person against whom the declaration is used, and further, the declaration must be in furtherance of such common purpose." That is true.

And here there was the common purpose of taking and holding illegal possession of the mine, and it was evidently said in furtherance of that purpose, by drawing the attention of those who held him, that they might release their hold on him, so that he might use his pistol, which he proceeded to do with fatal effect, as soon as their hold upon him was relaxed. The exclamation was also confirmatory evidence of the fact of the conspiracy, and was consequently prompted by the expectation on the part of Ray, that, if he should get into a difficulty, the prisoner, by reason of their relations to each other in the common enterprise, would stand by him. He could have no other reason for supposing it was the prisoner who had killed some one.

*Ex.* 6. Prisoner's counsel proposed to ask the prisoner while under examination in his own behalf, what Ray said to him before leaving Bakersville that induced him to go to the mine. Upon objection by the solicitor the court held that the prisoner would be allowed to testify as to his motive or purpose in going to the mine, in order to rebut proof offered by the State to show his motive or an unlawful purpose, but that the prisoner would not be allowed for that purpose to state the declarations of Ray. There can be no valid objection to this ruling. There is no principle of evidence upon which it was admissible. The only ground upon which such a declaration could be admitted, would be where it formed a part of the *res gestœ*. But to constitute *res gestœ* there must be a *thing done*—some *act* which may be explained by declarations made while the thing or act is being done or transacted. But there was nothing of that sort here. The declaration proposed to be proved was made before the parties had started on their unfortunate enterprise.

*Ex.* 7. The solicitor offered to prove that on Saturday night immediately preceding the Sunday on which the homicide was committed, Ray attempted to "smoke" out of the mine, Miller and others, who were in the lower shaft, by building a fire near the mouth of a tunnel leading into the pit, and forcing the smoke into it. He threw dirt into the pit, with the view, he said, of scaring them. The evidence was offered to show that Miller and Ray were in the actual possession of the lower shaft at that time, and to contradict what the prisoner said Ray had told him about having peaceable possession of the mine. The prisoner's counsel insisted that this evidence was incompetent, that it could only be admitted upon the ground that it was an act in furtherance of a common design between the prisoner and Ray to take possession of the mine at any hazard, and there was no sufficient evidence to connect the prisoner up to that time with any such design. But we think the prisoner's testimony was fully sufficient to show a common purpose between him and Ray to take possession of the

mine, even if no other evidence had been offered on that point. He stated that he had heard that the mine was valuable; had heard four or five times before that Miller and Buchanan were working the mine; had talked to a party about taking possession of it before he went to see Ray; did not persuade Ray to come to the mine; his wife did not want him to go. He told Ray that Reuben Sparks said he had a good title to the mine, and Bayley had none; that he had business in Madison county, and was at Ray's house on Monday or Tuesday before the homicide. Ray came over from Madison county with him to his house, on Thursday. He thinks he sent a message, perhaps wrote a note, to Sparks on Friday. Ray left his house on Friday, and returned to Bakersville on Saturday, where he met him. Can it be doubted by any one after hearing this statement by the prisoner, that he and Ray had formed the purpose of taking the possession of the mine on Saturday before the homicide? But if that were not so, there is ample proof of the conspiracy after the occurrence of Saturday night, and acts of Ray on that night were competent evidence against the prisoner, for it makes no difference at what time the party accused entered into the conspiracy or combination, because any one who agrees with others to effect a common illegal purpose, is generally considered in law as a party to every act which either had been done or may afterwards be done by the conspirators, in furtherance of the common design. *Taylor's Ev.*, §529.

After a careful perusal of the instructions asked, and those given by the Court, we do not think the prisoner has any cause for complaint. The instructions given to the jury were a substantial compliance with those asked by the prisoner, in fact, were in some instances, more favorable to him than was warranted by the facts. But the prisoner contended that there was error in the refusal to charge the jury, "that if the first shot was fired under a reasonable apprehension of great bodily harm, the subsequent shots would not make the prisoner guilty, if fired under like apprehension." The request was substantially complied

48

with in the fourth instruction given by His Honor to the jury, which was as follows: "If the prisoner went down to the lower shaft for the purpose of separating persons there engaged in a breach of the peace, and did not enter into the fight willingly, he was without fault in bringing on the fight; and if he went down for that purpose and did not fight willingly, but acted only on a well grounded apprehension of great bodily harm in shooting deceased, then the prisoner would not be guilty."

The prisoner's counsel further insisted there was error in refusing to give the sixth prayer for instruction, namely, " If the prisoner entered upon the premises in a peaceable manner, and the deceased, acting on an old grudge, made an assault upon him of a deadly character, the slaying would be justifiable."

The prisoner's counsel contended that the prisoner had the right to enter into the mine, and cited authorities to the effect, that if the party who enters is the owner, he gains both scizin and possession, although the claimant of the adverse interest is at the time actually upon the premises. But, unfortunately for the prisoner, the principle has no application to his case. He was not the owner, neither he, nor Ray, nor Sparks. Neither had any pretence of a title as appears from the record. It is true Ray showed a paper to Miller while in the mine, and said he had a deed for the mine, but it was evidently a sham, for if he had had such a deed, the prisoner would certainly have produced it or a copy on the trial, as he had a right to do, if there was such an instrument. *State* v. *Shepherd*, 8 Ired., 195.

But the prisoner and his confederates, Ray and the two Sparks, so far from being owners or having any title to the property, as appears by the record were mere *tort feasors*, and Miller and Buchanan had the right not only to defend their possession, but to use the necessary means for their expulsion from the premises.

The grounds assigned by the prisoner's counsel for the arrest of the judgment are quite as untenable as the exceptions taken to the charge of the court. There were no exceptions in the

grounds assigned for the arrest of the judgment to the form of the affidavit for removal, but only that Yancey county was embraced in the affidavit and order of removal. If the affidavit for the removal from the county of Mitchell was sufficient, the exclusion of Yancey in the affidavit and order could not vitiate the order of removal. It need not have been stated in the affidavit. The sole object of the removal is to secure a fair and impartial trial, and if it should be made to appear to the court, that Yancey county was obnoxious to the same objection as Mitchell, the court ought not to have moved the case to that county, no matter from what source it obtains the information, whether by affidavit or otherwise. The county to which the cause is removed, always lies in the discretion of the court, provided it be an adjacent county.

It is no ground for arresting the judgment that there were two transcripts of the case sent from Mitchell to Caldwell, although the first was defective and the second transmitted without a writ of *certiorari*. The writ of *certiorari* is only issued when there is a defect in the record, which is discovered by the court, or brought to its notice. When the clerk sends a defective record, it is not a compliance with the order, and he may send another. If the transcripts are contradictory, the contradiction may be reconciled by an inspection of the original record by the court to which it is removed, but when they are not contradictory they form but one copy and both may be used by the court. *State* v. *Collins*, 3 Dev., 117.

The last ground of arrest taken by the prisoner's counsel cannot be sustained. The record shows that the prisoner was arraigned, and then following immediately thereafter before any order remanding prisoner to jail, the affidavit was offered and the order for removal made—it sufficiently appears by a necessary implication, that he was present when the order was made. *State* v. *Craton*, 6 Ired., 164; *State* v. *Chavis*, 80 N. C., 353, and cases there cited.

Our conclusion, after a careful examination of the record in the case, in view of the very grave importance of our decision to the prisoner, is that there is no error.

This opinion must be certified to the Superior Court of Caldwell county that the case may be proceeded with in conformity to this opinion and the law of the land.

No error.                                                    Affirmed.